UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARPER LAKE, LLC, a California limited liability corporation,<br><br>    Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendants. | Case No. EDCV 08-59-VAP(JCRx)<br><br>MEMORANDUM OPINION AND FINDINGS OF FACT & CONCLUSIONS OF LAW<br>[F. R. CIV. PROC. 52] |

    Plaintiff's claims for negligence and private nuisance were tried to the Court on April 7, 8, 14, 15, 16, 17, 21 and 22, 2009; the parties each filed timely post-trial briefs on April 24, 2009, and the Court then took the matter under submission. Having considered all the evidence admitted at trial, the arguments of counsel, and all the briefing submitted by the parties, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, and issues its decision below.

# FINDINGS OF FACT

1. Henry Orlosky[1] formed Plaintiff Harper Lake, LLC ("Harper Lake"), a California limited liability corporation, in 2003. Exh. 23. Orlosky was an investor in, and secured creditor of, Harper Lake Energy Corporation ("HLEC"); at some time before 1998, HLEC acquired a portion of the property known as the Lockhart Ranch, in the Mojave Desert about 20 miles northwest of Barstow. The Ranch at one time operated a cattle feed lot and alfalfa processing plant, and a General Store, the Lockhart residence, and worker housing also stood on the property. Pretrial Conference Order ("PTCO") ¶ 5 ("Admitted Facts") (a), (g), (j).

2. The Orlosky Family Trust acquired HLEC's Lockhart Ranch acreage by a Trustee's Deed recorded on April 2, 1999. The structure at issue in this lawsuit ("the Building") sits on this portion of the Ranch. PTCO ¶ 5 (j). In June, 2004, after the formation of the limited liability corporation the year before, the Orlosky Family Trust transferred the acreage acquired from HLEC, as well as additional contiguous acreage since acquired, to Harper Lake. Exh. 24. After these transfers, Harper Lake owned approximately 3,000 contiguous acres and associated water rights ("the property"). PTCO ¶ 5 (k).

3. The Building is located on the west side of Harper Lake Road near Hinkley, California; it was built in 1951 as a "General Store" and has not been operated since 1957. It is approximately 7,200 square feet. PTCO ¶ 5(a), (b).

4. The Building sits within a restricted airspace, the R-2515, controlled by Edwards Air Force Base ("AFB"). PTCO ¶ 5(c). The United States Air

---

[1] Henry Orlosky is the Managing Member, Chairman and Chief Executive Officer of Plaintiff Harper Lake. (Exh. 23.)

Force is the principal user of the R-2515 airspace, but non-Air Force aircraft also use the restricted airspace, including NASA aircraft, and aircraft from two private outfits, the National Test Pilot School, and BAE Systems.

## CONDITION OF THE BUILDING BEFORE THE DATE
## OF THE ALLEGED INCIDENT

5.  Plaintiff's eyewitnesses, David DeBates and Stanley Cooley, testified they were living in the caretaker's house[2] on the Lockhart Ranch property, when on an unknown date in April, 2005, they heard an unusually loud sonic boom.  When they went outside, they both testified, they saw a large section of the roof on the Building had collapsed.  Neither reported this to anyone at the Air Force.

6.  Plaintiff listed two different dates in April, 2005 on the claims forms Orlosky submitted to the Air Force seeking compensation for damages to the Building allegedly caused by a sonic boom.  <u>See</u> Exhs. 26, 1116, 1117.  Orlosky gave a third date, April 22, 2005, when he first called the Air Force in July, 2005 to report the roof's collapse.  Exh. 28.  For the purposes of its discussion below, therefore, the Court refers generally to the entire month of April, 2005 as the date the Building's roof collapsed, or "the incident."

7.  The entire Building, including its roof, was poorly maintained and in general disrepair as of April, 2005.  Dozens of photographs taken by the Air Force's inspection team that went out to inspect the Building in July, 2005, as well as the testimony of Rica Lynn, Amy Frost, Gary

---

[2] The caretaker's house was situated about 300 feet away from the Building.

1  Franklin, Juan de la Vega, Warren Neville, and other witnesses,
2  established the following:
3  ● Water damage of a long-standing nature riddled the Building's
4    interior, shown in large numbers of extensively stained, mildewed
5    and warped ceiling tiles in many parts of the Building where the
6    roof had not collapsed, as well as peeling paint and water-stained
7    walls (Exh. 1062-14, -15, -34, -743, -750, -751, -754, -766, -768,
8    -769);
9  ● the parapet of the Building showed cracks and splits (Exh. 1062-
10   673, -676, -710-711, -713, -714; Exh. 8-3, 8-4, 8-5, 8-6 and 8-14.]
11 ● hornets' and wasps' nests, spider egg sacs and spider webs were
12   found in many locations in the Building's interior rooms (Exh.
13   1062-63, -680, -753);
14 ● ceiling light fixtures were missing, disfigured by water damage, or
15   hanging askew and obviously inoperable (Exh. 1062-744, -751,
16   -753, -766, and -768);
17 ● the Building's exterior walls bore extensive damage from long-
18   standing water leakage (Exhs. 1062-34, -673, -738, -762 through
19   -778) ;
20 ● vandals had defaced the Building's exterior and interior walls with
21   graffiti in several places, and shell casings and damage from
22   bullet shots into the exterior walls, were found in various areas
23   around the Building (Exh. 1062-726, -757, and -759).
24 8. The Court found unconvincing Plaintiff's evidence regarding the upkeep
25    and repairs allegedly performed on the Building before April, 2005.
26    Nick Grill, owner of Terrawatt Construction, a contractor Plaintiff hired
27    occasionally to perform repairs on the Ranch and its equipment,
28

    testified about sporadic work he did, primarily after April, 2005, but Plaintiff presented only one invoice for any repair or maintenance work before April, 2005. Exh. 14. Plaintiff produced no other evidence – cancelled checks, financial records, or invoices – to demonstrate payment for repairs or maintenance on the Building before the incident.

9. The testimony of Cooley and DeBates on the subject of the Building's maintenance similarly was unpersuasive. Neither witness gave specific details of the repairs or maintenance allegedly done before April, 2005. Instead, they gave only vague testimony about the duties performed by Stanley Smith, their grandfather and the former caretaker. (Smith died sometime before 2005 and was incapacitated by a stroke for at least six months before his death.) Furthermore, their testimony and that of Henry Orlosky that the building was "well-maintained" was belied directly by the photographic evidence from July 2005 showing the effects of long-term neglect and lack of maintenance, described above. The Building's general state of disrepair and neglect was substantiated further by the testimony of several witnesses who stated they had never seen anyone working on, maintaining, or performing repairs on the Building during the years before the incident. Hence, Plaintiff failed to demonstrate that the building was consistently maintained before the incident in April, 2005 and was in a state of good repair as of that date.

## EVIDENCE OF THE BUILDING'S VALUE

10. When HLEC acquired the property on which the Building stands in approximately 1998, it was required by the lender to obtain property insurance; it bought a one-year policy at a premium cost of $5,734.20. The policy was effective starting August 17, 1998, described the

1    Building as "vacant," and provided one million dollars coverage for it.
2    (Exh. 50.)
3  11.  HLEC did not renew that insurance coverage on the Building, and never
4      obtained any other insurance on the Building. Neither the Orlosky
5      Family Trust nor Harper Lake ever obtained any insurance on the
6      Building.
7  12.  In connection with efforts to obtain a bank loan in 2002, Orlosky
8      obtained an appraisal on the property on which the Building stood ("the
9      property"). He asked Roger Doverspike, a Member of the Appraisal
10     Institute, to appraise the value of the property, i.e., "the land and water
11     rights."  Mr. Doverspike prepared a written appraisal dated March 27,
12     2002. (Exh. 1047.)
13 13.  In Doverspike's opinion, the Building (and the other structures on the
14     property) contributed no value to the property: "these improvements
15     have no economic value and as such were not valued. In fact, they are
16     a detriment and after salvage, I estimate a net cost of $30,000 to
17     demolish and carry off the improvements." (Exh. 1047-19.)
18 14.  Doverspike prepared another appraisal in 2006 for Harper Lake, after
19     the alleged incident causing the Building's roof's collapse, and while the
20     latter's claim for damages was pending with the Air Force. (Exh. 1048.)
21     Again, Harper Lake sought this appraisal in connection with an effort to
22     obtain a bank loan. This 2006 appraisal made a reference to the
23     owner's stated intention to refurbish the Building "into a construction
24     office building," (see Exh. 1048), but this did not alter the appraiser's
25     earlier opinion regarding the highest and best use of the property, the
26     need for the removal of all the improvements, including the Building, or

1  the negative value of the structures on the property because of the cost
2  of demolishing and removing them.[3]
3  15. Harper Lake sold its entire 3,000 acreage parcel, including the Building
4      and the other structures located thereon, to Solucar, Inc., a subsidiary
5      of Abengoa Solar, Inc. ("Abengoa") in May, 2007, for a total sales price
6      of approximately $30,000,000.00.  Exh. 1015-5.
7  16. The Purchase and Sales Agreement consummating the sale of Harper
8      Lake's Lockhart Ranch property to Abengoa, makes no reference to the
9      Building, nor assigns any value to it.  Exh. 1015.[4]
10 17. Orlosky, testifying on behalf of Harper Lake as the owner of the
11     property, opined that the Building was worth $1,000,000 in April, 2005
12     (pre-incident).  Among other things, he based his opinion on the
13     presence of amenities such as a freight elevator, a finished basement,
14     an industrial scale, a canopy, and the presence of natural gas and
15     electricity hookups.  He also based his opinion of value on the premise
16     that the Building would be an attractive feature to a buyer of the entire
17     acreage, because it was suitable for use as office space for a solar
18     energy facility, citing conversations with potential purchasers, including
19     Duke Solar and Florida Power & Light.
20 18. The owner's opinion of the Building's value in this case is not well-
21     grounded, for the following reasons (among others):
22     ● Orlosky described the Building as "well-maintained," yet the
23       dozens of photographs of its interior and exterior taken in July,

---

[3] Doverspike's 2006 appraisal increased the estimated amount for the demolition and removal costs to $35,000.  Exh. 1048-14.

[4] Harper Lake did not disclose its pending appeal of the denial of its claim with the United States in the sales documents, despite the requirement that it list any litigation regarding the property.  Exh. 1015-151.

2005, depict a dilapidated structure suffering from extensive neglect resulting in long-extant water damage, vandalism, decay, and pest and insect infestation.  See Finding 7, above.

- Orlosky's opinion relied on conversations he held with potential buyers, but produced no documentation of any purchase negotiations with any of the entities he identified, much less adduced any documentary evidence substantiating the claim that the potential buyers were particularly interested in the Building as an attractive feature.  As noted above, however, the documentation of the actual sale of the property makes no mention whatsoever of the Building, (see Exh. 1015), and Abengoa, the actual buyer of the property, intends to demolish the Building.  Exh. 1056.

- A comparison of the Building with the administrative office buildings located in the adjoining properties' solar energy fields reveals the former's unsuitability for such use.  The latter structures are recently built and contain a host of features not present in the Building, see e.g., Exh. 1054-6 through -10; the subject Building was approximately 54 years old in April, 2005, was used for such purposes as weighing cattle and alfalfa and a general merchandise store, and lacks features of the buildings used on modern solar energy facilities.

- Orlosky testified that in his opinion, the Building's location on the edge of the property adjacent to Harper Lake Road increased its value.  The evidence regarding the highest and best use for the property as a solar energy facility went uncontradicted at trial; even assuming the Building was adaptable for use on a solar

8

    energy field, its location was much more likely to be a drawback than an advantage.  Glen King, an employee of Florida Power & Light, testified that the area where the Building was situated would be best used as part of the solar energy field, and that administrative buildings in solar energy developments were most advantageously located between SEGS.[5]

- Orlosky cited the "time advantage" an existing building would represent to a buyer, but the uncontradicted evidence at trial established that development of a solar energy facility is a very lengthy, years-long, undertaking.  Orlosky himself estimated the process took ten years.  Hence, this "advantage" appears slight, if not ephemeral.

- Orlosky relied on the $1,000,000 value on the Building referenced in the insurance policy HLEC obtained on the property in 1999.  He conceded, however, that it was only his "belief" that this value was based on any appraisal done by the insurance company, and could not even state whether or not the insurance agent or any appraiser had viewed or inspected the Building before the policy was issued.  Moreover, neither HLEC's immediate successor in interest, the Orlosky Family Trust, nor Harper Lake, had ever insured the Building after the one-year policy elapsed in 1999.

///
///
///
///
///

---

[5]"SEGS" is an acronym for Solar Energy Generating Systems.

**EXPERT APPRAISAL EVIDENCE**

**Plaintiff's Evidence**

19. Plaintiff offered the testimony of Paul Jacobs, a certified appraiser, that $1,113,000 represented "the cost to rebuild or the diminution in value" caused by the destruction of the Building's roof.  The Court finds Jacobs's testimony and opinion regarding the value of the Building unreliable and untrustworthy, and declines to give them any weight, for the following reasons.

20. Jacobs prepared the appraisal on a "rush" basis; Orlosky first contacted Jacobs about undertaking the appraisal on December 18, 2008, met with him the next day, and asked to him prepare an appraisal report in merely three days, i.e., by December 21, 2008.

21. Jacobs was not independent and did not prepare a neutral appraisal.  In fact, his letter transmitting (one of) his opinion(s) on the Building's value explicitly stated that it was prepared "in litigation support of your case," i.e., it was not a neutral opinion prepared by an independent appraiser, but rather a document crafted to support a particular result.  Exh. 1501-1.

22. This lack of independence is confirmed further in an exchange of electronic mail ("email") messages between Jacobs and Orlosky on January 19 and 20, 2009 regarding the former's "draft" appraisal report. Orlosky wrote to the appraiser on January 19 in relevant part as follows:

> we [Harper Lake LLC] are hoping to garner a value that is near and/or supports our claim amount, which we are looking for you alone to guide us.  [¶]  In light of such matters, there a two [sic] items in your draft report that we believe do not help us and we ask that

you consider how you may address our concerns, which I attempted to voice below: [¶] 1. We do not believe Steve Faulk's report [which Jacobs had cited and relied upon in his opinion] and/or his numbers are reasonable, fair, or just and the building could not be repaired as he states; therefore, please consider removing all references to Faulk and either employ a separate expert instead . . . *we do not want to make or use any reference to Faulk or his diminution of value number which we are convinced is considerably below the cost to repair value.* [¶] 2. We prefer using real world independent contractors for the cost to repair estimates or gather additional quotes from other real world building experts in the building trades or simply do not provide an opinion without obtaining additional data. . . ."

Exh. 1515; emphasis added.

23. Jacobs responded to Orlosky's message in relevant part as follows:

As I see it here are your choices:

A. I discussed the use of Falk's [sic.] estimate with Marlo and we agreed it was the best course of action because it reduced the value of the building the least versus contractor bids, which include repair of vandalism since the incident versus [¶] B. Use the average of the contractors['] bids and end up with a building worth less than replacement resulting under federal rules of you receiving nothing. [¶] C. Use the

11

|   |     |                                                                                     |
|---|-----|-------------------------------------------------------------------------------------|

1       age/Liffe [sic] method reported in Marshall & Swift and
2       virtually all texts on appraisal application.  This
3       approach reports a typical economic life of 45 years.
4       The subject by all references I have found exceeds 45
5       years of age as of 4/15/05 thus we would be back to
6       the B above. . . ."
7 Id.  Jacobs admitted that Orlosky "pressured" him to change his opinion
8 regarding the Building's value.
9 24. Jacobs's opinion was undercut also by the existence of his earlier
10     reports opining far differently on the pre-incident value of the Building.
11     For example, in a report dated January 17, 2009,  Jacobs opined that
12     the pre-incident value of the Building was $926,000.00 and its post-
13     incident value was $767,000.00; hence, the alleged diminution in value
14     due to the incident would be $159,000.00.  See Exh. 1503-16.
15     Jacobs's efforts to explain away the significance of this amount were
16     unconvincing.
17 25. In his first report, dated December 31, 2008, Jacobs rendered an
18     opinion that the value of the Building in April, 2005 was $564,800.00. [6]
19     Exh. 1502-15.  Plaintiff did not disclose this report in discovery,
20     however; it was inadvertently shown to the defense during Jacobs's
21     deposition.   On January 7, 2009, Jacobs signed a letter report opining
22     that the Building's value pre-incident was "at least $966,000.00" –
23     approximately $400,000 higher than the value he attributed to it one

---

[6] Jacobs's December 31, 2008 report bears his signed certification as a licensed California appraiser; none of his later reports bear this certification. Exhs. 1502-3, 1503, 1505, 1508.

12

1 week earlier.[7]  Exh.1501.  Then he issued the January 17, 2009 report,
2 Exhibit 1505, opining the building had a value of $926,000 as of April
3 15, 2005.  This triggered the email exchange with Orlosky, and four
4 days later, on January 21, 2009, he issued another report, this one
5 finding the Building had suffered a diminution in value of $1,113,000.
6 Exh. 1505-16.  When confronted during cross-examination regarding
7 the variances in his valuation of the Building, Jacobs was only able to
8 state that "he hoped" the last appraisal – the highest – was the correct
9 one.

26. Jacobs's opinion regarding the cost of repair suffers from additional serious flaws.  Jacobs admitted he only spoke to one of the three alleged bidders to rebuild the roof, and relied primarily on this bid in estimating costs of repair.  His estimate included more than $100,000 in costs to remove debris and clean up the property, although evidence to support that was not only lacking, but contradicted by the evidence that Terrawatt Construction had estimated $35,000 for such work.  Jacobs also admitted that his opinion on replacement costs was based on estimates of costs to replace or repair the Building and put it in compliance with current building codes.  Furthermore, his opinion was based in part on "assurances that considerable funds had been expended on repairs, renovation and security prior to the incident." Exh. 1505-2.  That assumption was contradicted by the evidence at trial.  See Findings 7, 8.

---

[7] Orlosky admitted during his trial testimony that he "may have" had conversations with Jacobs between the time the December 31, 2008 report was completed and what he described as an "amended" reports were completed and disclosed in January, 2009.

13

27. Finally, Jacobs's testimony and overall demeanor were sufficiently out of the ordinary, particularly for a retained expert, to warrant comment. Certainly many witnesses, even retained expert witnesses experienced and skilled at responding to the unique challenges of cross-examination by able counsel, may be inarticulate on the witness stand. Mr. Jacobs, however, was evasive, often unfamiliar with the material about which he was expected to testify, frequently gave confusing and contradictory answers even to straightforward questions, and most disturbingly, on redirect examination volunteered a startling narrative regarding his psychological state and his marital problems.

28. In summary, the Court declines to accord any weight to the appraisal opinions of Plaintiff's expert on real property valuation because of (1) the glaring inconsistencies in the various opinions rendered; (2) the witness's inability to explain satisfactorily the reasons for the inconsistencies; (3) the evidence, including Jacobs's admission, that the appraiser was "pressured" by Orlosky to change his opinions and reach more favorable ones; (4) his over-reliance on certain amenities allegedly present in the Building; (5) his reliance on assurances from the owner that "considerable funds" had been expended before the incident to keep the Building in good repair; (6) the extremely limited research and investigation performed in preparing the appraiser's opinions and reports regarding value; (7) Jacobs's evasive demeanor and manner while testifying; and (8) the inconsistencies between his testimony and assumptions and the other evidence in the case. His testimony was remarkable not for his skill, expertise, training or knowledge, but rather for his willingness to shed the principles of his profession and adapt his opinions to fit the cloth of his client's needs.

**Defendant's Evidence**

29. The defense offered the testimony of Warren Neville, a Member of the Appraisal Institute, regarding the value of the Building in April, 2005.

30. Neville concluded that the Building added no value to Harper Lake's property. Exh. 1045. He based his conclusion, in part, on his findings that the highest and best use of the land on which the Building was situated was solar energy development, and the Building was not suitable for use in the construction or operation of a solar energy facility. These findings are supported by evidence that the property's purchaser, Abengoa, intends to demolish the Building "and use the land on which [it] stands as part of a solar field." Exh. 1056.

31. Neville reached his opinion regarding valuation after twice inspecting the property, researching the state of the permits and zoning for the Building, reviewing the General Plan for San Bernardino County and interviewing county Planning Department employees regarding permitted usage for the Building, interviewing the Project Manager of the current owner of the property where the Building is located, and reviewing the CEDAT report and photographs, among other investigation. In arriving at his opinion, he noted both physical and functional depreciation: the Building's "poor condition" and considerable amount of deferred maintenance -- the extensively water-stained condition of interior and exterior walls and rusted window frames, demonstrating long-term neglect, and the lack of a truly functional basement, freight elevator and industrial scale in the Building. Neville also relied on "economic depreciation," i.e., the location of the Building in an area which once had been thriving economically, but was no longer so.

1  32. Neville testified he was not aware of the Doverspike appraisals at the time he completed his appraisal report, but learned of them after completing his assignment to appraise the subject property. He testified that his opinion regarding the value of Harper Lake's property was consistent with both Doverspike appraisals, i.e., that the Building added no value to the property.

### DAMAGE TO PLAINTIFF'S PROPERTY

33. The parties to this lawsuit dispute vigorously the cause of the collapse of the roof on the Building in April, 2005; Plaintiff contends the roof collapsed because of a sonic boom from aircraft flying in the restricted air space. The Court finds it unnecessary to resolve this issue, however, as the evidence at trial established clearly that Plaintiff suffered no diminution in the value of its property, and hence no damages, resulting from the roof's collapse, whatever its cause.

34. Credible evidence regarding the value of Harper Lake's property came from Defendant's MAI appraiser, Warren Neville, and the two appraisals completed by MAI appraiser Roger Doverspike at Plaintiff's request (or the request of Plaintiff's predecessor in interest). Neville, after conducting an independent and exceedingly thorough investigation, and applying a rigorous analysis, concluded that as of April, 2005 (pre-incident), the Building added no value to the property.

35. Neville reached his conclusion before he became aware of and reviewed the Doverspike appraisals, which likewise concluded the Building added no value to Harper Lake's property. The Doverspike appraisals provide strong support for the conclusion that the Building added no value to the property because (1) they were done at Plaintiff's

|   |   |
|---|---|
| 1 | behest; they were performed by an appraiser chosen by Plaintiff; and |
| 2 | (3) Plaintiff sought both for the purpose of assisting it in obtaining a |
| 3 | commercial loan.  To the extent he based his opinion on the poor |
| 4 | condition of the Building, abundant evidence supports that finding.  <u>See</u> |
| 5 | Finding 7, above. |
| 6  36. | That all three of these appraisals reach the same conclusion regarding |
| 7 | the lack of value attributable to the Building defeats Plaintiff's claim |
| 8 | here.   The testimony of Plaintiff's appraiser Jacobs, discredited for the |
| 9 | reasons discussed above, and the testimony by Orlosky as property |
| 10 | owner, found unreliable for the reasons set forth above, do not suffice |
| 11 | to carry Plaintiff's burden of proof that its property suffered any |
| 12 | diminution in market value as a result of the collapse of the Building's |
| 13 | roof. |

### OTHER DAMAGES

37. Orlosky testified at trial that Harper Lake paid Terrawatt, Inc. approximately $70,000 to clear away the debris after the collapse of the Building's roof, as well as $1,000 to take pictures of the damage.  <u>See</u> Exh. 13.  In answer to interrogatories propounded by Defendant United States regarding its damages, however, Harper Lake  did not disclose or refer to any damages consisting of clean-up costs after the collapse of the Building's roof.  Exh. 1004.  In response to a discovery request for documents supporting the claim for damages, Harper Lake responded that no such documents existed.  Exh. 1002-14 (Request No. 24).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

2. The alleged acts of Defendant United States giving rise to this action occurred within the jurisdiction of the Central District of California, and the Court applies the California substantive law of negligence.  28 U.S.C. §§ 1346(b), 2674.

3. To prove negligence, a plaintiff must show "that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of *injuries suffered by the plaintiff.*"  Ann M. v. Pac. Plaza Shopping Ctr., 6 Cal. 4th 666, 673 (1993; emphasis added) (citing United States Liab. Ins. Co. v. Haidinger-Hayes, Inc. (1970) 1 Cal.3d 586, 594; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, p. 60).

4. "Under the Federal Tort Claims Act, claimants are entitled to compensatory damages, which, under the Act, are governed by state law."  Fort Vancouver Plywd. Co. v. United States, 747 F.2d 547, 553 (9th Cir. 1984) (citations omitted).

5. California Civil Code section 3333 provides the following general measure of damages applied in tort actions :  "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  The measure of damages for tortious injury to property, as claimed by Plaintiff here, is "generally determined as the difference between the value of the property before and after the injury."  Heninger v. Dunn, 101 Cal. App. 3d 858, 861-62 (1980) (citations omitted.)

6. Although diminution in market value is not the only measure of damages available to a plaintiff seeking compensation for injury to real property, the California courts have foreclosed recovery of the alternative measure of damages, i.e., restoration costs, where such costs would exceed the diminution in value caused by a defendant's negligence. "Courts normally will not award costs of repair or restoration if they exceed the diminution in the value of the property; the plaintiff may be awarded the lesser of the two amounts. . . . [T]he rule in California is the same." Heninger, 101 Cal. App. 3d at 862 (citations omitted).

7. Plaintiff Harper Lake has failed to meet its burden of proving that it suffered a diminution in the value of its property as a result of the incident in April, 2005. Thus, it has failed to prove its damages, one of the required elements of its negligence claim against Defendant. As the evidence at trial established, and as the Court has found, above, that there was no diminution in value, Plaintiff cannot recover damages in the form of costs of restoration or repair, as such costs would exceed the decrease in market value and thus are not permitted. Heninger, 101 Cal. App. 3d at 862.

8. As Plaintiff did not suffer any loss from the collapse of the Building's roof, any award of damages would be unjust. "A plaintiff in a tort action is not, in being awarded damages, to be placed in a better position than he would have been had the wrong not been done." Valdez v. Taylor Automobile Co., 129 Cal. App. 2d 810, 821- 822 (1954) (citation omitted). "The primary object of an award of damages in a civil action, and the fundamental principle on which it is based, are just compensation or indemnity for the loss or injury sustained by the

1  complainant, and no more." Mozzetti, 67 Cal. App.3d at 576; citations
2  omitted.
3  9. Plaintiff's claimed damages for costs incurred for removal of debris, and
4  the post-collapse photographs, are unrecoverable for an additional
5  reason: Plaintiff failed to disclose the information regarding these
6  alleged damages in discovery, and therefore is barred from using it at
7  trial. F. R. Civ. Proc. 37(c)(1).
8  10. Plaintiff's claim for recovery under a theory of private nuisance is barred
9  by its failure to prove negligence under the Federal Tort Claims Act.
10  Laird v. Nelms, 406 U.S. 797, 801-02 (1972); Dalehite v. United States,
11  346 U.S. 15, 44-45 (1953).

For the reasons set forth above, the Court orders that judgment shall be entered in favor of Defendant United States and Plaintiff shall take nothing by its Complaint.

Dated: May 21, 2009

_____
VIRGINIA A. PHILLIPS
United States District Judge